We do not think that we are authorized to so decree.

Fellman v. Mercantile & Marine Ins. Co., 116 La. 723, 41 South. 49, is to the contrary. Moreover, the Constitution does not exclude holidays. Why should we? The publication on the 4th of July was not an illegality. Laws may be promulgated on all days except Sundays. The statement is included incidently, for, as before stated, the 52 La. Ann. and 28 South. case is controlling.

For reasons assigned, the law and the evidence being in favor of plaintiff and against the defendants, the judgment appealed from is affirmed at appellant's costs.

MONROE, PROVOSTY, and LAND, JJ., concur in the decree.

---

(48 South. 304.)

No. 17,219.

RILEY v. UNION SAWMILL CO.

(Jan. 4, 1909. Rehearing Denied Feb. 1, 1909.)

1. LOGS AND LOGGING (§ 3*)—SALE OF STANDING TIMBER—CONTRACTS—CONSTRUCTION.

The language of a contract must be presumed to have been intended to have some meaning, and as an agreement, between individuals, that one of them should return for assessment, and pay taxes on, his own property, would be without meaning, a stipulation, in an inchoate contract for the sale of timber, to the effect that the party named as vendee should return the timber for assessment and pay the taxes thereon from the date of its acquisition, will be construed to mean that, for the purposes of assessment and taxation, at all events, such person was to be regarded as the owner of the timber from the date of the instrument, and hence as having assumed the obligation to relieve the other party of the burden of paying the taxes on it from that date.

[Ed. Note.—For other cases, see Logs and Logging, Dec. Dig. § 3.*]

2. LOGS AND LOGGING (§ 3*)—SALE OF STANDING TIMBER—PERFORMANCE OF CONTRACT.

Returning an inchoate contract for the sale of timber, for assessment, as an option, and paying taxes thereon, does not discharge an obligation to return the timber for assessment and pay the taxes thereon.

[Ed. Note.—For other cases, see Logs and Logging, Dec. Dig. § 3.*]

3. LOGS AND LOGGING (§ 3*)—SALES—CONSTRUCTION—PERSONAL GRANT TO BUYER.

Where an instrument, purporting to be a sale of standing timber, contains the stipulation "all rights acquired by, and privileges granted to, the said second party, under this sale and contract, shall vest in, and inure to the benefit of, his heirs, successors, and assigns," the proposition that the grant is personal to the original grantee is untenable.

[Ed. Note.—For other cases, see Logs and Logging, Dec. Dig. § 3.*]

4. CONTRACTS (§ 10*)—VALIDITY—MUTUALITY.

An inchoate contract to sell standing timber, wherein the party of the one part says, in effect, to the other: "If you assent to this contract at once, and thereby bind yourself thenceforth to return the timber for assessment, and to pay the taxes thereon, and further bind yourself to cut and remove the timber within 10 years, or within 20 years if you elect to pay the price herein stipulated for the extension of time, and to pay for such timber at the rate of 50 cents per 1,000 feet monthly, as the same is cut and removed, or pay 10 cents per acre per year on the land for the last 10 years of the term of the contract, then I sell and transfer the timber to you for those considerations; provided that, should a standard-gauge railway not be built to X. within 4⅔ years, this engagement to be null," is not, if converted by the assent of the other party into a contract, void for want of consideration or mutuality of obligation.

[Ed. Note.—For other cases, see Contracts, Dec. Dig. § 10.*]

5. LOGS AND LOGGING (§ 3*) — CONTRACTS — TIME FOR ACCEPTANCE.

Where an obligation purports to be a sale in præsenti of standing timber and to impose obligations, to be executed in the future, upon the person named as vendee, but such person does not sign the instrument or assume such obligations, and the circumstances do not authorize the conclusion that the person signing the instrument as vendor had any other intention than that expressed in the instrument, there is no contract, and no time other than as absolutely necessary, is allowed for the assent of the named vendee, and the signer, upon being notified several years afterwards of such assent, is within his rights in signifying his change of intention and withdrawing the offer.

[Ed. Note.—For other cases, see Logs and Logging, Dec. Dig. § 3.*]

(Syllabus by the Court.)

Appeal from Fourth Judicial District Court, Parish of Union; Robert Brooks Dawkins, Judge.

Action by William Riley against the Union Sawmill Company. Judgment for plaintiff, and defendant appeals. Affirmed.

Lamkin, Millsaps & Dawkins, for appellant. Clayton, Hawthorn & Atkinson and Elder & Moore, for appellee.

### Statement of the Case.

MONROE, J. Plaintiff, as the owner of a tract of land described as the E. ½ of the S. E. ¼ of Sec. 19, and the S. W. ¼ of S. W. ¼ of Sec. 20, T. 23 N., R. 3 E., in the parish of Union, sues defendant for damages for cutting and removing timber therefrom, felling and damaging timber thereon, for his alleged malicious arrest, and for loss of time, annoyance, and expense resulting therefrom. He alleges that defendant fraudulently pretends to be the owner of the timber on said land, under a title derived, through mesne conveyances, from an instrument executed by him (plaintiff) in favor of John McShane, but that the alleged contract evidenced by said instrument is void for want of consideration, for want of mutuality of obligation, and because the conditions were not complied with.

He obtained a preliminary injunction restraining defendant from further trespassing pending the suit, and he prays that it be made perpetual, and that he have judgment for the damages alleged by him. Defendant, for answer, sets up title through mesne conveyances, from McShane to all the merchantable white oak, pine, and cypress timber on the land in question, and alleges that McShane acquired said timber from plaintiff by warranty deed, regular in form, and expressing a fair consideration in the obligations assumed by him, and that it, respondent, acquired in good faith and for a sound price, without knowledge of possible

122 LA.—28

equities between the former owners. It further alleges that it and its immediate authors have paid the taxes assessed against the timber, and that a railroad has been built to Farmerville in discharge of part of the obligations assumed by McShane as grantee of said timber, all to the knowledge of plaintiff, and that, having received consideration for his grant, plaintiff is estopped to deny its binding effect. Defendant alleges that the injunction was maliciously obtained and has occasioned it loss, and it reconvenes for damages.

It appears from the evidence that plaintiff acquired the land in question as a homestead by patent from the United States, of date October 11, 1902, prior to which date, to wit, on March 18, 1902, he had executed an instrument in writing, reading in part as follows:

"This contract and agreement, entered into on this, the 18th day of March, 1902, by and between William Riley, * * * party of the first part, and John McShane, * * * party of the second part.

"Witnesseth: That the party of the first part, being the sole owner of * * * E. ½ of S. E. ¼, Sec. 19, & S. W. ¼ of S. W. ¼, Sec. 20, T. 23, R. 3, E., containing 120 acres, more or less, has granted, bargained and sold, and does, by these presents, sell and convey and transfer unto the said second party, all the merchantable white oak, cypress and pine timber, growing, standing, or being, on said land, for the price and sum of 50 cents per thousand feet, payable at the end of each month as the same shall be cut and removed. That, for the purpose of cutting, felling and removing said timber, the party of the second part shall have possession of said land and the right to cut out and construct roads and tramways over, and across, the same, and the right to use the same for the removal of timber he may buy on lands adjoining, and beyond, that described herein, and to have free ingress and egress for employés, teams and vehicles into, upon, and off the same. The party of the second party shall cut and remove (the timber) from the land herein described, within ten years from the date hereof, and, upon the failure to do so within said time, the said party of the second part shall have the right to prolong the period of performance, and preserve all rights vested in him by this sale and agreement, for ten years additional, by paying to said party of the first part, commencing at the expiration of the first ten years, ten cents an acre, per year, for each acre from which the timber shall not have been cut and removed, during the

prolonged period, which payment, when made, shall be in full compensation for any and all claims or demands, of whatever nature, for the failure of the second party to cut and remove timber within the first and second periods of time herein granted.

"It is further agreed that, whenever said timber shall be cut and removed, the party of the second part shall enter into full possession of said land, at once, whether the time for such removal be expired or not; provided, that all right of railroad and right of way herein granted shall be perpetual, said right of way to be not less than fifty feet wide, and the same shall be used for a regular freight and passenger railroad, before, during, and after the removal of the timber, and so long as the same is operated as a railroad.

"As part of the consideration for the execution of this contract, the second party binds and obligates himself to render for assessment, and pay all legal taxes imposed upon, the timber purchased, from the date of its acquisition.

"It is agreed, in case the Hamburg, Ruston and Southern Railway, or some other standard gauge railway is not completed to Marion, La., within 4⅔ years from date hereof, this contract shall be null and void.

"In case of sale, lease, or transfer of said land, said first party agrees to reserve and protect the rights of the second party, as the same exist under this contract.

"All rights, acquired by, and privileges, granted to, said second party under this sale and contract, shall vest in, and inure to the benefit of, his heirs, successors and assigns.

"Done and signed, in the presence of the undersigned witnesses, on the day and year above written, at Marion, Union parish, Louisiana.

"William X Riley.
his          mark

"Attest: [Signed] J. L. Hopkins.
"F. M. Powell."

This instrument was recorded in Union parish (though at what time does not appear), and whatever rights were acquired under it by McShane were conveyed by him to John Lockwood and H. W. Ragan, by act of date January 17, 1903, and on June 30th, following, Lockwood and Ragan, together with Geo. T. Ross, Frederick D. Hager, and W. F. Jackson, executed an instrument, which recites that they each, with McShane, owned an undivided interest in all the standing timber described in certain timber deeds (which appear to have been specified, and to have included that from Riley reproduced above); and further reads, in part, as follows:

"That said deeds, or sales, though, apparently, made to John A. McShane, were, in truth * * * made to and owned by appearers, in indivision with * * * McShane."

That Lockwood and Ragan had bought McShane's interest by deed, of date, etc.

"That they, the said appearers * * *, accept said deed * * * and assume all the duties and obligations imposed therein upon the grantee, and especially, the following, viz.:

"(1) The obligation to construct, or cause to be constructed a standard gauge railway, northerly, through the parish of Union to a connection with the line of road of the El Dorado and Bastrop Railway Co., in Union county, Arkansas, and within the limit of time and upon the course, or route specified in said deeds. * * *

"(2) To pay all taxes legally assessed against said timber and real rights conveyed by said deeds.

"(3) To pay the said vendors, their heirs or assigns, 50 cents per thousand for said timber, monthly, as the same may be cut and removed. * * *

"(4) And, generally, to do and perform any and all other things, provided for in said deeds, to be kept and performed by said grantees. * * *"

On October 7, 1903, Lockwood, Ragan, Ross, Hager, Jackson, and J. J. Booles executed a deed whereby they sold to the Pine Hill Lumber Company—

"all the merchantable white oak, pine, gum, cypress and other timber, on the following described lands: * * *

"E. ½ of S. E. ¼ of S. 19, and S. ½ of S. W. ¼ of S. 20, T. 23 N., R. 3 E.
*     *     *     *     *     *     *

On October 31, 1906, the Pine Hill Lumber Company sold to defendant—

"all of the pine, cypress and hardwood timber owned" by it "and standing and growing upon the following described lands, situated in the parish of Union. * * *"

The deed, as copied in the record, contains the following:

"Note: This deed contains several pages of description, but the description, east half of southeast quarter, sec. 19, and southwest quarter of southwest quarter of section twenty, does not appear therein."

The deed, however, continues:

"All of the above described lands, upon which the timber is sold * * * are situated in the parish of Union, Louisiana, and north of Bayou D'Arbonne, and the same are designed and in-

tended as being all the timber and timbered lands owned by the Pine Hill Lumber Company, Limited, in said parish and state, north of Bayou D'Arbonne, at this time, and in the event that any timber or timbered lands, not herein specially described, shall be found to belong to the Pine Hill Lumber Co. Limited, the same shall and is hereby intended to be, the property of this vendee, with full and complete warranty of title."

It further appears that, just before this suit was brought, defendant sent a gang of men on the land here in question to cut the timber, and that plaintiff protested against their doing so, and, before they had gone very far with their work, caused the writ of injunction to issue. Prior to the issuance of the writ, however, Bratton, defendant's employé, who was in charge of the men, being told that plaintiff was disposed to be belligerent and had made certain threats, which appeared to intimidate his men, consulted defendant's attorneys, and, upon their advice, made an affidavit charging that plaintiff had said:

"That if the said timber was cut by affiant and the other parties * * *, it would have to be done over his dead body, and that, from the statements made and actions of the said William Riley, affiant has just cause to apprehend that he intends to break or disturb the peace or to do him and the other parties mentioned some bodily harm, and that it is necessary, and affiant prays, that he, the said Riley, be placed under a peace bond for their protection in cutting said timber."

And plaintiff, who lives in the country (on the land in question), was accordingly notified by the constable to appear in town (Marion), which he did, and, being understood to have waived a hearing, gave bond to keep the peace. He was at no time subjected to actual restraint, but lost practically the entire day from his work. It is shown that defendant's men cut and removed about 22,000 feet of timber and felled about 1,600 feet, which was not removed, but was destroyed by worms or insects, and that the timber was worth about $2 per thousand.

"It is admitted that the defendant was going upon the land to cut the timber, acting in good faith that he (it) was the bona fide owner; that defendant was the owner of the timber."

The judge a quo gave judgment, perpetuating the injunction, condemning defendant to—

"pay $46.77 as damages for the cutting and removing of timber, * * * and the further sum of $25, as attorney's fees for the enjoining of the trespass"—

and rejecting plaintiff's claim for expenses incurred in the prosecution of this suit, and for damages claimed for malicious prosecution. Defendant has appealed, and plaintiff answers, praying that the amount awarded be increased.

## Opinion.

There was offered in evidence, on the trial in the district court, the record in the case of W. B. Thompson & Co. v. Union Sawmill Co. et als., in which a grant to McShane, almost identical in terms with that here involved, was considered, about the only difference being that, whereas in the Thompson Case the instrument contained the stipulation that the grant ("contract") should be void unless the Hamburg, Ruston & Southern Railway should be completed within two years, the stipulation in the present case reads:

"It is agreed, in case the Hamburg, Ruston & Southern Railway, or some other standard gauge railway, is not completed, to Marion, within 4⅔ years from date hereof, this contract shall be null and void."

In the Thompson Case, it was found that the road mentioned was not completed within the time stipulated, or at all, and Mr. Justice Nicholls, as the organ of this court, said:

"If parties had, prior to that time, by acceptance, acquired the right to cut down trees and remove the same, and had in fact commenced doing so * * * within two years, that right came to an end by the very fact itself that the time limit had expired without the completion of the road, and, if the right of cutting and removing timber had not been exercised up to that time (which it was not), it could not be exercised thereafter. The stipulation on that subject was the controlling stipulation of the whole act; all the other clauses and stipulations of the instrument were held in

check and subordination and governed by it." W. B. Thompson & Co. v. Union Sawmill Co., 46 South. 341, 121 La. 318.

From which, and from the language of the syllabus, it appears that the decision was based upon the nonfulfillment of the "controlling stipulation" thus referred to. The case of Union Sawmill Co. v. Lake Lumber Co., 120 La. 106, 44 South. 1000, presented a similar state of facts, and was similarly decided. It is true that, in both of the cases thus referred to, the court considered and expressed some views upon other questions presented than that of the noncompletion of the railroad, but that circumstance cannot have affected the rights of the parties to this suit, which were fixed long before the opinions in the cases mentioned were handed down.

In the instant case, it appears that the stipulation in question was fulfilled, and that a standard-gauge road was completed to Marion in September, '1904, well within the 4⅔ years from the date of the instrument in which said stipulation was embodied. If, therefore, the "McShane contract," now before the court, is to be declared void ab initio and of no effect, it must be for some other reason than the noncompletion of the railroad. Plaintiff's grounds of attack are stated, in substance, as follows:

"(1) That said pretended contract purports to be merely an offer to sell a license to cut and remove the said timber to the said McShane, and was, and is, without consideration, and was personal to him, which said offer was never signed and accepted by the said McShane.

"(2) * * * In the alternative, * * * that the said pretended contract is null and void, for want of mutuality; that the said McShane does not bind himself to cut and remove the said timber or to pay the price, or to do or perform, or not to do or perform, any act or thing thereunder whatsoever. * * *

"(3) That, should the court hold that said pretended instrument is not null and void, for any of the reasons hereinabove set forth, and in that event only, * * * that it is null and void for the reason that its conditions have not been complied with."

1 (3). Thinking it advisable to deal with these propositions in inverse order (as re-

gards that in which they are stated), we shall first consider the questions of the grantee's compliance vel non with the obligations imposed on him by plaintiff's offer or grant, and the happening vel non of the conditions upon which the offer or grant was to become a binding contract in all its parts. The first of the obligations assumed by defendant is to pay for the timber—

"at the end of each month, as the same shall be cut and removed."

The only cutting and removing of timber, under the authority of the alleged grant, appears to have been done in the month of April, and before the end of the month this suit had been instituted. At the time of its institution, therefore, there had been no default in the matter of payment. After the suit was instituted, it would have been idle for defendant to have made a tender of payment under an alleged contract which it is the purpose of the suit to repudiate and destroy. We next find that the grantee is allowed 20 years within which to cut and remove the timber, subject to the condition that, after the expiration of the first 10 years, he shall pay 10 cents an acre per year for each acre from which the timber shall not have been cut and removed "during the prolonged period." And, as the first 10 years have not yet passed, it is clear that he is not in default in the matter either of cutting the timber or of paying the acreage. The next obligation imposed upon the grantee is that he—

"shall render for assessment, and pay all legal taxes imposed upon the timber purchased, from the date of its acquisition."

There is nothing in the immediate transcript in this case to show that the grantee, or those who hold under him, have ever returned the timber here in question for assessment or have ever paid taxes on it. Turning to the transcript in the Thompson Case (which is made part of this transcript),

we find nothing conclusive upon the subject. Of course, it would require no stipulation in a contract between plaintiff and McShane to impose upon the latter the obligation to pay taxes on his own property, and, as that matter was one in which plaintiff had no interest whatever, the stipulation in question either means nothing, or it means that, for the purpose of assessment and taxation, at all events, McShane was to be considered as acquiring the timber by virtue of the grant contained in the alleged contract, and hence as coming under an obligation to relieve plaintiff of the burden of taxation that might otherwise be assessed against him. We gather from the evidence in the Thompson Case that those who acquired, directly, or through mesne conveyance, from McShane, have been assessed, in some instances upon the timber (probably where, as appears to have been done quite frequently, the grantees had closed the transactions by paying down the whole agreed price), and in other instances that they have been assessed upon the contracts (if they may be so called) held by them as options, and we rather infer that the inchoate contract here in question has been in that category, from which it would follow that the parties of the second part have not complied with their obligations to "render for assessment, and pay all legal taxes on the timber purchased," since returning a mere option for assessment and paying taxes on it is a very different thing from returning for assessment and paying taxes on the property that the option may give one the privilege of buying; the option in cases such as this, being assessed at 52 and 55 cents an acre, whilst the timber has been assessed at $2.50 an acre, and perhaps more, and the assessment of the option to the holder affording, as we imagine, no relief to the owner of the land and timber. Finally, we have the stipulation, or condition, that:

"In case the Hamburg, Ruston & Southern Railway or some other standard gauge railway, is not completed to Marion, La., within 4⅔ years, * * * this contract shall be null and void"—

which was, no doubt, of prime importance to both parties, since the evidence shows, upon the one hand, that the people of Union parish were exceedingly anxious that railroads should be built to connect them with the outer world, and, upon the other, that, without a railroad, McShane and his associates had no way of finding a market for their timber, even at 50 cents per 1,000 feet, and it appears that they worked energetically and successfully to have a road built. H. W. Ragan, testifying in the Thompson Case, was asked what part he took in the building of the Farmerville & Southern Railroad, and he answered, and further testified, as follows, to wit:

"I was identified with this matter from the very start wherein the company was made to secure some pine timber. We first had to find out if we could secure enough timber to justify the construction of a railroad, and, after some six or eight months' work, we thought we had sufficient timber to justify the building of a road; at least, some of us thought so, but Mr. McShane did not; he didn't think, after an estimate of the timber was made, that we had enough, so he withdrew from the enterprise, and myself and Mr. Lockwood bought him out. * * * After we had purchased the interest of Mr. McShane in the property, I, personally, took the matter up with the officials of the Missouri Pacific Railroad Company, in St. Louis, and told them of the enterprise we had started down in Union parish, and told them that it was necessary to build a railroad and secure the tonnage that we had contracted for, and that we did not have sufficient capital to build the road. * * * They wanted to know how much tonnage we had, and we told them 350,000,000 feet. They agreed to build the line provided we guaranteed the tonnage that we had secured, and made a contract we had signed up, in the proper manner, by the main individuals who were party to it."

Which contract, he says, was absolutely complied with, and, as we understood it, was a contract of date February 14, 1903, whereby it was agreed between Ragan and others, of the first part, and the St. Louis, Iron Mountain & Southern Railroad Company, of the second part, that the parties of

the first part owned 350,000,000 feet of standing timber in the parishes of Union and Lincoln, subject to the fulfillment of the conditions under which it had been acquired; that said parties owned or controlled all the capital stock (and subscriptions thereto) of the Ruston, Hamburg & Southern Railroad Company; that they were the owners of all the property and rights acquired and guaranteed to McShane and others, acting as a committee to represent the property holders of Union parish to secure the building of a railroad to Farmerville and Marion; that they should give and secure to the party of the second part all traffic in timber, lumber, etc., which they then owned, or might thereafter own or control, in said parishes; that they should turn over to the party of the second part their interest in and control of the Ruston, Hamburg & Southern Railroad Company; that they should provide a right of way for the road to be built by the party of the second part and ground for terminal facilities in the towns named and at other places; that they should pay to the party of the second part $6,000, and any other sums or land that might have been earned by the Ruston, etc., Railroad Company; and that they should give bond for the faithful performance of their obligations; that the party of the second part should, before May 1, 1903, begin the construction of a standard-gauge road in the parish of Union, to be completed, from Farmerville, through Marion, in a northerly direction, to the Arkansas line, and, thence, to a point of connection with the El·Dorado & Bastrop Road, in Arkansas, within 12 months.

And there are some other stipulations which need not be set out at length. By supplemental contract of even date with the original, the parties of the first part agreed, substantially, to divide with the party of the second part any profit that might be made in the buying and selling of town sites, and

further agreed to furnish, without charge, all the timber needed for cross-ties for the road from Farmerville to the connection with the Bastrop, etc., Road, in Arkansas. And by a further contract, of May 26, 1904, the parties of the first part, with others, agreed to allow the Farmerville & Southern Road to connect with the main line track of the Little Rock & Monroe Road; the result of it all being, as we have stated, that there was a standard-gauge road completed to Marion in September, 1904.

2 (2). Considering the question of mutuality of obligation vel non, and assuming that McShane or his transferees have in some way assented to the inchoate contract signed by plaintiff, it is clear that McShane did not bind himself to build the railroad to which we have been referring, or to cause it to be built. Upon the other hand, as plaintiff's obligation ceased, unless he did build the road, or cause it to be built, within 4⅔ years, they were, at least, mutually interested that the road should be built, and the happening of that event may be said to have been a "mixed condition," which was also "suspensive" in fact, if not in law. Mixed, because the happening of the event depended partly upon McShane and partly upon the capitalists whom he needed to assist him (Rev. Civ. Code, art. 2025); suspensive, in the sense that McShane could not avail himself of the right to remove the timber until a railroad was built, and could have no object in cutting it unless he could remove it. The instrument in question, after reciting that plaintiff—

"has granted, bargained and sold, and does, by these presents, sell and convey and transfer * * * all the * * * timber * * *, for the price of 50 cents per 1,000 feet, payable at the end of each month, as the same shall be cut"—

and, after granting to the party of the second part the right of entry on the land, etc., proceeds as follows:

"The party of the second part shall cut and remove [the timber] * * * within ten years,

and, upon his failure to do so, within said time, * * * shall have the right to prolong the period of performance * * * by paying, commencing at the expiration of the first ten years, ten cents an acre, per year, for each acre from which the timber shall not have been cut and removed, during the prolonged period, which payment, when made, shall be in full compensation for any and all claims or demands, of whatsoever nature, for the failure of the second party to cut and remove timber within the first and second periods of the time herein granted."

It will thus be seen that there is an obligation imposed on the party of the second part to cut and remove certain timber from certain land within a certain time, which, however, by the last clause of the paragraph, may be discharged by the payment of the acreage during the second period of the term for which the contract is to run. It is true that, to persons not interested in the matter, the time allowed may appear long, and the consideration for which it is to be extended beyond the period first mentioned may appear inadequate; but the right to fix the time within and the consideration for which a contract shall be executed belongs to the contracting parties, and not to persons who are without interest in the contract, or to the courts. They are essential parts of the right to contract, and about all that our law has to say upon the subject of the time is to declare what shall be considered days, months, and years in ascertaining what is intended to be the "term" of a contract. Rev. Civ. Code, art. 2408 et seq.

The instrument in question, therefore, discloses, upon the one hand, the various obligations assumed by the plaintiff to give the vendee possession of the land, in order that he may cut and remove the timber sold, to permit the construction and maintenance of a railroad thereon, to protect the rights of the vendee in the event of his selling the land or mortgaging it, etc.; and, upon the other hand, the obligations assumed by the vendee (taking for granted, for the moment, that the offer contained in the instrument

was accepted by him) to return the timber purchased by him for assessment and pay the taxes on it, and to pay the price agreed on for the timber each month as he cuts and removes it, or pay 10 cents an acre per year for the last 10 years of the term of the contract, from which it follows that the instrument (with the acceptance) evidences a bilateral, commutative contract; that is to say, a contract in which the parties expressly enter into mutual engagements, and in which, according to its terms—

"what is done, given or promised, by one party, is considered as equivalent to, or a consideration for, what is done, given or promised by the other." Rev. Civ. Code, arts. 1765, 1768.

3 (1). Plaintiff alleges that his offer was personal to McShane, but the instrument containing the offer concludes as follows:

"All rights acquired by, and privileges granted to, said second party, under this sale and contract, shall vest in, and inure to the benefit of, his heirs, successors and assigns"—

from which it follows that McShane had the right to assign the contract, at least, from the moment at which he himself became bound. Plaintiff says that the offer was without consideration, and was not accepted by the offeree. If the offer has never been accepted, no contract has resulted, and, unless it was then too late, the offer may be considered as having been withdrawn by the institution of this suit, and the offerer can no longer be held bound. On the other hand, if the offer has been accepted, then a contract has resulted, and the consideration is to be found in the obligations assumed by the offeree by virtue of such acceptance. The questions, then, are, what was it necessary for the offeree to do in order to convert the offer into a contract? And what has he, or what have his "successors and assigns," done? Considering the offer or inchoate contract a little more particularly, it amounts to this: The party of the first part says to the other, in effect:

"If you assent to this contract at once, and thereby bind yourself henceforth to return the timber herein referred to for assessment, and to pay the taxes on it, and further bind yourself to cut and remove the timber within 10 years, or within 20 years if you choose to pay the amount herein stipulated for the extension of time, and to pay for such timber at the rate of 50 cents per 1,000 feet monthly as you cut and remove it, or pay 10 cents an acre per year on the land for the last 10 years of the term of the contract, then I sell and transfer the timber to you, for those considerations; provided, however, if a standard-gauge railway is not built to Marion within 4⅖ years, this engagement is to be null and void."

It is important in this connection to observe what we may have called an "offer" is not in the form of an offer at all. The language used imports a contract, completed at the moment by the assent of both the parties thereto, and the idea that it was so intended is confirmed by the fact that J. L. Hopkins, at whose instance plaintiff affixed his mark to the instrument, and who witnessed the mark, appears to have subscribed to an affidavit, indorsed upon the instrument, and reading as follows, to wit:

"State of Louisiana, Parish of Union.

"Before me, T. L. Holloway, a justice of the peace in and for this parish and state, duly commissioned and qualified, personally came and appeared J. L. Hopkins, to me well known, one of the attesting witnesses to the within and foregoing private act of sale and contract, who, being, first, duly sworn, says that he saw the contracting parties sign the same, also saw the other witnesses sign, and signed himself, as such, on the day and date therein mentioned, and he verily believes the same was done in good faith and for the uses and purposes and considerations therein set forth.
                    "[Signed] J. L. Hopkins.
"Sworn to and subscribed at Marion, La., this 7th day of May, 1902, before me, T. L. Holloway, J. P."

Whether Hopkins was authorized to bind McShane to anything does not appear, but his affidavit is peculiar, in that he swears that he saw the "contracting parties" sign the instrument to which it refers, when, in point of fact, one of the parties has never signed, to this day, and the cross mark of the other was not made until May 18, 1902, 11 days after the affidavit purports to have

been made. It serves, however, as we have said, to confirm the impression, created by the language of the instrument, that it was not plaintiff's intention to give any more time in the matter than might be necessary for McShane's agent to take the instrument to him and obtain his signature.

It will be observed, too, that the instrument is not like an ordinary deed, evidencing a sale in which the vendor acquits the vendee of all further obligation by giving a receipt in full for the price of the thing sold. It purports to be a contract whereby the vendee assumes certain obligations, to be discharged in the future, but which he did not assume, and, as he did not become bound, neither did the plaintiff.

"It is the assent of the parties which gives the contract its binding force; both must be bound or neither." Cavelier v. Germain, 6 La. 218.

Article 1809 of the Revised Civil Code reads:

"The obligation of a contract not being complete, until the acceptance, or, in cases where it is implied by law, until the circumstances which raise such implications are known to the party proposing, he may, therefore, revoke his offer or proposition before such acceptance, but not without allowing such reasonable time, as, from the terms of his offer, he has given, or, from the circumstances of the case, he may be supposed to have intended to give to the party, to communicate his determination."

Where, however, from the terms of the offer, and, from the circumstances of the case, it appears that it was not the intention to give the offeree any time, not absolutely necessary to communicate his determination, and it also appears that the offeree did not act within such time, the offerer need only signify his change of intention when he receives the unqualified assent of the offeree. Rev. Civ. Code, art. 1801.

So far as the record shows, no unqualified assent of the offeree in this case was ever communicated to the offerer until defendant's men appeared upon his place and began cutting his timber, whereupon, and im-

mediately, he signified that he had changed the intention expressed in the instrument to which he had affixed his mark some five years before. We are of opinion that he had that right.

Plaintiff having waived his right to a hearing in the matter of his arrest, and having been placed under bond to keep the peace, that proceeding cannot be inquired into here, and, in view of the result, he has no standing with respect to his claim for damages therefor. Nor do we otherwise find any sufficient reason for increasing the award made by the district court.

The judgment appealed from is therefore affirmed.